MELLON BANK, N.A. individually and as Agent, the Union National Bank of Pittsburgh and Pittsburgh National Bank, Plaintiffs,

v.

MESTA MACHINE COMPANY, Debtor/Defendant.

Civ. A. No. 83–881.

United States District Court, W.D. Pennsylvania.

June 15, 1983.

George M. Cheever, Kirpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for plaintiffs.

Paul M. Singer and William J. Egan, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for debtor/defendant.

## OPINION

WEBER, District Judge.

On February 22, 1983, after considering the evidentiary material submitted and

hearing argument of counsel, the Bankruptcy Court determined that a $1,000,000 payment from the Mannesmann Demag Sack GmbH (hereinafter "Sack") to the debtor was not subject to the security interest of the appellant banks. The Banks on this appeal seek an order overturning the decision of the Bankruptcy Court and declaring all or part of the $1,000,000 payment subject to the security agreement between the parties. We conclude that the decision of the Bankruptcy Court contains no error of law and is supported by substantial evidence of record. The order of the Bankruptcy Court will therefore be affirmed.

The principle facts are not in dispute. On March 18, 1981, the Banks and Mesta entered into a new security agreement which provided the Banks with a security interest in virtually all of Mesta's assets, including general intangibles, with certain enumerated exceptions. The collateral subject to the security interest is described in Schedule C–III of the agreement, which states in pertinent part as follows:

(1) All Accounts, Contract Rights, and General Intangibles of the Company (as such terms are defined in the Pennsylvania Uniform Commercial Code and in this Amended and Restated Security Agreement), including without limitation all of the following:

(iii) all royalty, licensing and know-how agreements, except those between the Company, on the one hand, and ... Sack G.m.b.H. ..., on the other hand, wherein the Company is licensor...

At the time the security agreement was signed, Mesta was party to five license agreements with Sack. It is undisputed that these licensing agreements were excepted from the collateral by the above-quoted portion of the security agreement.

On February 5, 1983, Mesta and Sack entered a new agreement in which Sack obligated itself to pay to Mesta $1,000,000 immediately and two future payments of $75,000 each. The $1,000,000 was tendered on February 9, 1983. It is this $1,000,000 payment which the Banks contend is subject to their security agreement with Mesta.

The Bankruptcy Court granted the Banks' motion for a temporary restraining order preventing the use by Mesta of the $1,000,000 payment. After hearing and argument the Bankruptcy Court ordered the injunction dissolved. It is this order which is the subject of this appeal.

The Banks argue that the February 5, 1983 agreement is not a "royalty, licensing [or] know-how agreement" and therefore falls within those general intangibles covered by the security agreement. We do not agree. The February 5, 1983 agreement may be properly characterized as an acceleration of the obligations in the existing licensing agreements with Sack. By the terms of the February 5 agreement the payment by Sack was to satisfy existing royalties due and estimated future royalties under the existing licensing agreements. In return, the existing licensing agreements were terminated and Sack was granted a permanent, paid-up license. In essence, Mesta obtained its expected future royalties in a lump sum in the present and Sack obtained a permanent license. This, undeniably, is a license agreement.

Even if it is a license agreement, the Banks contend that it is not excluded from the collateral because it was not in existence on March 18, 1981, the date that the security agreement was signed. Two facts refute this argument. First, Schedule C–III of the security agreement includes both collateral and the exceptions "whether now existing or hereafter arising or acquired." There is no requirement, explicit or implied, which limits the exceptions to those existing on March 18, 1981, and indeed the above-quoted language indicates the contrary. Second, even if we adopt the Banks' construction of Schedule C–III, the February 5 agreement is nothing more than the disposition of assets already excluded from collateral. The royalties due under the original licensing agreements were not subject to the security interest and the accelerated obligations are no different. The $1,000,000 payment by Sack is in effect the proceeds of the original licensing agree-

ments and therefore excluded from the scope of the Banks' security interest.

The Banks further argue that even though the February 5 agreement is a licensing agreement and falls within the exceptions to collateral, the right to receive the $1,000,000 payment is a separate and distinct interest, falls within the definition of a general intangible, and is therefore subject to the security interest. This convoluted logic is unpersuasive. The right to receive the payment from Sack is part and parcel of a licensing agreement which is excluded from the collateral. The Banks' position would have us exclude the licensing agreement from the collateral but include the attendant obligation of payment. The payment by Sack arises directly from the license agreements and is therefore not subject to the Bank's security interest.

In an attempt to seize at least a portion of the Sack payment, the Banks rely on a chart prepared for Mesta's negotiator prior to the February 5 agreement. The chart sets a dollar value on the various subjects for negotiation with Sack. Because the chart allocates 65% of the value to the release of claims and a permanent license, the Banks argue that this court should declare 65% of the Sack payment to be subject to the security interest and not within the exceptions of Schedule C–III.

The primary flaw in the Banks' method of allocating value is that the chart is merely a negotiating tool for one party in the negotiations. Any use of the chart to allocate values in the completed agreement is merely speculative. We cannot determine the values that the parties to the contract eventually assigned to the various aspects of the agreement from the pre-negotiation estimates of one party. Estimated values may change drastically during the course of negotiation and the instant case presents an example. Although Mesta's chart assigns some value to a release of claims against Sack, the deposition testimony of Mesta's negotiator, Mr. Miller, reveals that Sack placed no value on a release because Mesta had no claims against Sack.

In the absence of evidence of the final understanding of the parties as to value, we cannot make any allocation of value, and the chart prepared by Mesta permits only speculation as to value.

In short, the Bankruptcy Court made no error of law and its findings are supported by substantial evidence of record. Therefore the order dissolving the temporary restraining order will be affirmed and the appeal dismissed.